

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-23-2004

# USA v. Himler

Precedential or Non-Precedential: Precedential

Docket No. 03-1387

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Himler" (2004). *2004 Decisions.* Paper 1041.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1041

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed January 23, 2004

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-1387

UNITED STATES OF AMERICA

v.

HARRY JOSEPH HIMLER
aka
Michael D. Zorn
aka
Michael P. Zunr

HARRY JOSEPH HIMLER,
                              *Appellant*

On Appeal From The United States District Court For
The Western District Of Pennsylvania
(D.C. No. 02-cr-00137)
District Judge: Honorable Maurice B. Cohill, Jr.

Argued October 23, 2003

Before: ALITO, FUENTES, and BECKER,
             *Circuit Judges*

(Filed January 23, 2004)

SHELLY STARK
KAREN S. GERLACH
Federal Public Defender
MARKETA SIMS (Argued)
Assistant Federal Public Defender
1450 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA 15222
   *Attorneys for Appellant*

MARY BETH BUCHANAN
United States Attorney
PAUL M. THOMPSON (Argued)
BONNIE R. SCHLUETER
Assistant United States Attorney
700 Grant Street
Suite 400
Pittsburgh, PA 15219
   *Attorneys for Appellee*

---

## OPINION OF THE COURT

BECKER, *Circuit Judge.*

Defendant Harry Joseph Himler ("Himler"), who fraudulently bought a condominium in Greensburg, Pennsylvania by tendering false checks in the amount of $195,000 in violation of 18 U.S.C. § 513(a), pled guilty to the offense. After the sentencing hearing, the District Court, without notice to the parties, departed upward, imposing a 36 month sentence when the applicable United States Sentencing Guidelines ("U.S.S.G.") range was 24 to 30 months. *See* U.S.S.G. Ch. 5 Pt. A. In calculating this sentence, the District Court found that Himler intended to cause a loss of between $120,000 and $200,000 pursuant to U.S.S.G. §2.B1 (b) (1) (F), and ordered restitution to the victim in the amount of $193,833, the amount paid for the condominium, to be offset by the amount of the future sale of the condominium.

Himler raises five issues on appeal: (1) he contends that the District Court erred in finding that he intended to cause

a loss of between $120,000 and $200,000 when he tendered the counterfeit checks and thereby erred in applying a ten-level enhancement under the U.S.S.G.; (2) he claims that the District Court failed to rule on his motion for downward departure; (3) he argues that the District Court was not entitled to order the restitution that it did, (4) he submits that the District Court erred in departing upward because it failed to give him notice that it intended to do so; and (5) he argues that, the notice issue aside, the District Court erred in imposing an upward departure on the merits of the case.

We conclude that the District Court did not err in finding that Himler intended to cause a loss of between $120,000 and $200,000 and that the restitution it ordered was appropriate as a matter of law. However, because we conclude that the District Court committed a legal error in departing upward without giving notice to the parties, we will vacate the sentence and remand for a new hearing on this issue. Because we remand based on the District Court's failure to provide notice and will instruct the District Court to hold a new sentencing hearing, we will not reach the question pertaining to the potential failure to rule on the motion for downward departure, nor will we reach the merits of the Court's imposition of an upward departure. Rather, in remanding for a new hearing, we will give the District Court maximum opportunity to reexamine the appropriateness of both upward and downward departure during the course of the resentencing.

## I.  Facts and Procedural History

On May 31, 2002, Himler, using a false name, purchased a condominium using two counterfeit cashier's checks totaling $195,000. Himler committed this criminal act, apparently motivated by a desire to provide a private place where he and his girlfriend could spend time together away from their respective families, with whom they lived. According to Himler, a friend of his who was a realtor started to look for a condominium on his behalf and soon one thing led to another: before he knew what hit him, Carol, his girlfriend, had "fallen in love" with the condominium at issue and Himler told the realtor to "take

it off the market," even though he knew that he did not have the money to pay for it.

The settlement company that handled the closing, Complete Settlement Services ("CSS") was owned by Matthew Curiale ("Curiale"). At the closing, a CSS representative took possession of Himler's counterfeit checks and paid the seller of the condominium, John Hanna ("Hanna"), $193,833. (The remaining $1,167 was for the cost of title insurance and a refund due back to Himler.) The representative then deposited the checks in Southwest Bank ("Southwest").

Within days of the closing, CSS was overdrawn $130,000 on its Southwest account because Himler's counterfeit checks had not been honored, and Southwest tried to cover the deficit by taking more than $70,000 from other accounts that it held for CSS, including accounts of other clients. Southwest eventually sued CSS and Curiale, seeking more than $130,000 in compensatory damages.

Approximately one week after the closing, a CSS representative called Himler to tell him that his checks had been returned "without reason." Apparently, Himler directed her to "redeposit" them. When Himler learned that the checks had been returned a second time, he created and cashed several phony payroll checks, again under a false name, in order to pay CSS some of the money he owed.

Finally, CSS ascertained that the Citibank checks Himler had tendered were, in fact, counterfeit and filed a civil suit against Himler, seeking an order enjoining him from possessing, conveying, or encumbering the condominium, and giving CSS immediate control over the property. On June 18, 2002, the Court of Common Pleas of Westmoreland County granted this request for immediate injunctive relief. Approximately one week later, Himler deeded the property back to CSS. CSS also informed the District Attorney of Himler's criminal conduct and Himler was arrested on June 19, 2002 and charged with theft by deception and bad checks. Himler admitted that the checks were counterfeit and cooperated with the investigation.

On July 16, 2002, a federal grand jury handed down a two-count indictment against Himler. Count I charged him with possessing fraudulent identification documents, a violation of 18 U.S.C. § 1028 (a) (6). Count II charged him with passing fraudulent checks, a violation of 18 U.S.C. § 513 (a). Himler eventually pled guilty to the charge in Count II in exchange for the government's agreement to dismiss Count I.

The District Court held a sentencing hearing on January 30, 2003. According to the presentence report ("PSR"), Himler's crime fell under U.S.S.G. § 2B1.1, a provision carrying an offense level of 6. However, the PSR recommended a 10-level increase in Himler's base offense level on the grounds that he intended to cause a loss of between $120,000 and $200,000. After subtracting 3 points for acceptance of responsibility, the PSR arrived at a total offense level of 13. When combined with a criminal history category of IV, Himler's final guideline range was 24 to 30 months' imprisonment. According to the PSR, there was "no information concerning the offense or the offender which would warrant a departure from the prescribed sentencing guidelines."

The PSR also concluded that the victims of the offense, CSS and Curiale, were entitled to restitution under 18 U.S.C. § 3663A. Recognizing that CSS had lost $193,833 when it accepted Himler's counterfeit checks in exchange for the property, the PSR nonetheless noted that CSS had regained title to the condominium. Accordingly, the PSR did not recommend a specific restitution amount, stating only that an "exact figure cannot be determined until the property actually sells."

At the sentencing hearing, Himler raised three objections to the PSR. First, he objected to its recommendation that his sentence should be increased by 10 levels under U.S.S.G. § 2B1.1 (b) (1) (F). Himler submits that he did not intend to cause *any* loss and certainly not the amount of loss ($120,000 to $200,000) suggested by the PSR. Second, Himler argued that the District Court should depart downward from the applicable guideline range under U.S.S.G. § 2B1.1, cmt. n.15 (B) because the offense level in the guidelines substantially overstated the seriousness of

the offense. Third, Himler objected to the PSR's recommendation that CSS receive monetary restitution under 18 U.S.C. § 3663A. According to Himler, his return of the condominium was sufficient restitution under the statute.

The Court ruled in the government's favor on all issues and departed upward *sua sponte*. Himler timely appealed. On April 14, 2003, CSS sold the condominium for $181,000. The government notified the District Court of the sale, and requested an order clarifying its restitution order. The District Court denied the motion, holding that it was without jurisdiction to issue an order while this case was pending on appeal. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 18 U.S.C. § 3742 (a).

## II.  Himler's Intended Loss

A District Court's finding of intended loss is one of fact, and will not be disturbed unless clearly erroneous. *See United States v. Geevers*, 226 F.3d 186, 192-93 (3d Cir. 2000). Himler argues that the district court erred in finding that he intended to cause a loss of between $120,000 and $200,000. Under the Sentencing Guidelines, "intended loss" means "the pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1 cmt. n.2 (A) (ii). Pursuant to Application Note 2 (A) (ii), "loss is the greater of actual loss or intended loss." *See also United States v. Nathan*, 188 F.3d 190, 208 (3d Cir. 1999) ("In general, the loss from fraud is the financial loss actually suffered by the victim, or the loss that the criminal intended the victim to suffer if that is greater.") (citing *United States v. Maurello*, 76 F.3d 1304, 1309 (3d Cir. 1996)). Application Note 2 (A) (ii) further provides: " 'Intended loss' (I) means the pecuniary harm that was intended to result from the offense; and (II) includes pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance claim in which the claim exceeded the insured value)."

Himler's principal argument is that, in order to obtain an enhancement based on the alleged amount of intended loss, the government was required to prove that Himler

subjectively intended to cause that loss, whereas, as a matter of fact, Himler never actually intended for the loss to occur. To support this contention, Himler points to his testimony at the sentencing hearing in which he explained that he presented the counterfeit checks at the closing because he had promised his girlfriend that he would buy the condominium and was embarrassed to tell her he did not have the money to do so. Himler further explains that the fact that he did not want to take possession of the condominium shows that he had no intention of causing a loss:

> I didn't want to take possession. When it went through, I didn't know what to tell Carol. I told her the condominium was being painted because [I] didn't want to go there. I was making every excuse in the world not to go there. I didn't know what was going to happen. I knew somebody is going to have to come there, the checks weren't good. I had no intention of taking that property. . . .

Himler also urges this Court to find that he had no subjective intent to cause a loss of $120,000 to $200,000 because he did not expect the counterfeit checks to be accepted at the closing or to be honored by Citibank, the bank upon which they supposedly were drawn. Further, Himler stated that he did not anticipate that CSS would pay out funds it did not have, and that he never intended for anyone to lose any money as a result of his actions. In short, the thrust of Himler's argument is that, although he handed over forged checks in order to buy the condominium, he was really just waiting to be caught and was, in fact, *hoping* to be caught.

This line of argumentation is unconvincing. Himler had many opportunities to come forward and admit to the forgery had he really wanted to "get caught." In *Geevers*, we explained that to "assume that Geevers did not want it all is to assume that had one of the banks somehow failed to detect his fraud and started sending Geevers monthly balance reports, Geevers would have refrained from taking any more of the money." *Geevers*, 226 F.3d at 193. The equivalent scenario here would be to imagine that had the bank not caught on to the forgery, Himler would have

voluntarily returned the condominium and simply walked away. Given Himler's continued silence in the face of the unraveling of his scheme, the "District Court could reject this proposition as unlikely." *Id.*

Himler also argues that the District Court based its finding solely on the face value amount of the forged checks and that, because this Court has rejected a *per se* rule that intended loss can be inferred from the face value of the check, the District Court committed an error of law. *See id.* at 188 (holding that intended loss "does not equal the face value of the deposited checks as a matter of law."). Himler's analysis is flawed. *Geevers* does establish that the "face value of the deposited checks is not to be mechanically assumed to be the intended loss." *Id.* at 194. However, *Geevers* also holds that "a sentencing court may consider that as sufficient evidence that it was the intended loss." *Id.* What *Geevers* stands for is not only that it is reasonable to infer that a defendant in Geevers' position intends the full loss of the face value of his false checks, but also that the matter "is not to be determined as a question of law, but as one of fact." *Id.* at 193.

In the case at bar, Himler handed over two forged checks in the combined amount of $195,000 for the purpose of buying a condominium. It was reasonable for the District Court to infer that he intended to reap the benefit of all $195,000, despite his assertions to the contrary, in light of the fact that in the time between the closing and his arrest, he never once made any move to reveal his fraudulent actions. In a case involving fraudulent checks, the defendant may "proffer evidence about his or her true intentions in order to rebut the presumption that his or her fraudulent deposits may create." *Id.* at 188. Himler proffered such evidence, but the District Court obviously did not credit it.

Since a finding of intended loss is one of fact, it must be upheld on appeal absent clear error. *See id.* at 194. There was ample evidence for the District Court to find that Himler intended a loss between $120,000 and $200,000: first, while not dispositive, there was the face value of the checks themselves, equaling $195,000. Second, there was Himler's continued silence and even affirmative acts to

perpetuate the fraud in the face of mounting questions about the authenticity of those checks. Those acts included his directions to "redeposit" the checks when the real estate agent called to tell him that the checks had been returned "without reason," and, after the checks had been returned a second time, creating and cashing several phony payroll checks in order to placate CSS and keep the scheme alive. Given the totality of the evidence against him, including but not limited to the face value of the forged checks, we conclude that the District Court did not commit clear error in finding that Himler intended to cause a loss between $120,000 and $200,000.

### III. The District Court's Sua Sponte Upward Departure

This Court's review of the permissibility of an upward departure is plenary. *See United States v. Holmes*, 193 F.3d 200, 203 (3d. Cir. 1999). In *Burns v. United States*, 501 U.S. 129, 138-39 (1991), the Supreme Court held that a district court cannot depart upward without providing notice to the parties that it intended to do so:

> [B]efore a district court can depart upward on a ground not identified as a ground for upward departure either in the presentence report or in a prehearing submission by the Government, [Fed. R. Crim. P.] 32 requires that the district court give the parties reasonable notice that it is contemplating such a ruling. This notice must specifically identify the ground on which the district court is contemplating an upward departure.

Himler argues, and the government concedes, that the District Court erred when it departed upward without providing notice to the parties. Both parties agree that the PSR did not identify any ground for upward departure and that the government never requested one. Under these circumstances, the District Court erred as a matter of law in making an upward departure.[1]

---

1. The parties disagree as to the grounds on which the District Court departed upward. Relying on the written judgment, Himler concludes that the upward departure was made due to his "past record" and "problems [he] created for the victim." The government relies on the oral

The government, however, contends that "this is only half the story," and that the District Court's error was harmless. A district court's failure to provide notice before departing upward may be considered harmless unless the defendant can prove that he would have done things differently had notice been given. *See, e.g.*, *United States v. Reynoso*, 254 F.3d 467, 475-76 (3d Cir. 2001) (failure to comply with *Burns* did not affect the defendant's substantial rights because, had proper notice been given, there was nothing that defense counsel would have done differently at the sentencing hearing); *United States v. Nappi*, 243 F.3d 758, 770 (3d Cir. 2001) (failure to provide notice under Fed. R. Crim. P. 32 does not affect "substantial rights" unless the defendant "would have done something by way of argument or proof . . . that probably would have impacted upon the Court's sentence"); *United States v. Rivera*, 192 F.3d 81, 88 (2d Cir. 1999) (holding that failure to provide notice before departing upward "may be harmless error unless the defendant can specify arguments he would have made that the district court did not consider").

The government contends that "the sentencing hearing focused primarily on the very issue upon which the court departed upward: the effect that Himler's crime had on CSS." The government argues that Himler and his counsel availed themselves of the opportunity at that hearing to

judgment and argues that the District Court based the upward departure on its conclusion that Himler had caused an "economic tragedy" for the victim. Since we are not reaching the merits of the upward departure, we will not attempt to analyze what the grounds for the upward departure were, though we note that the grounds do seem somewhat confused and indeterminate. We also note that if, as Himler contends, the District Court departed upward based on the "problems [Himler] created for the victim," the U.S.S.G. only provide for an upward departure when those problems rise to the level of extreme psychological injury. *See* U.S.S.G. § 5K2.3. If the District Court wishes to depart upward based on extreme psychological injury to the victim, it must make specific factual findings and articulate the reasons for the extent of the departure. *See United States v. Jacobs*, 167 F.3d 792, 798-801 (3d. Cir. 1999) (reversing an upward departure for extreme psychological injury based on the District Court's failure to make findings). No such findings have been made in the case at bar.

present oral and written argument about why the offense level overstated the seriousness of the offense and that "every piece of evidence, every word of testimony, and every argument that could have been marshaled against an upward departure was raised in Himler's defense." In short, the government contends that notice of the District Court's intention to depart upward would not have changed "either the substance or tenor of the debate." We disagree.

The burden is on the government to prove that the error was harmless. *See United States v. Stevens*, 223 F.3d 239, 242 n.4 (3d Cir. 2000). Some of our sister Circuits have held or implied that a district court's failure to give notice of its intention to depart upward amounts to constitutional error, and thus that the government must prove that the error was harmless *beyond a reasonable doubt. See, e.g., United States v. Lopreato*, 83 F.3d 571, 577 (2d Cir. 1996); *United States v. Paslay*, 971 F.2d 667, 674 (11th Cir. 1992). We have not reached the issue whether a district court's failure to give notice that it is contemplating an upward departure is constitutional error, and we need not do so here since the government has not met even the standard burden of proving that the error was harmless in this case.

Both in her briefs and at oral argument, Himler's counsel laid out a reasoned set of actions she would have undertaken on behalf of her client had she been on notice that an upward departure was being contemplated. She represents that, in addition to filing briefs arguing that the upward departure was not warranted under either the facts or the law, she would have "subpoenaed CSS's and Matthew Curiale's financial records to undermine those parties' claims of calamitous losses, and to investigate whether those clients suffered losses, and whether those losses were paid out of Mr. Curiale's personal funds as he claimed." This information would bear upon whether the offense "endangered the solvency or financial security," U.S.S.G. § 2B1.1 cmt. n.15 (A) (v), of CSS or Curiale, the victims of the scheme under Fed. R. Crim. P. 32 (i) (4) (B). Counsel explains that those records had not been subpoenaed because the presentence report and the Court made it clear that Himler was going to be sentenced on the basis of intended rather than actual loss.

In the same vein, counsel also points out that the District Court made no findings as required by Fed. R. Crim. P. 32 (i)(3)(B) and argues that had the Court provided Himler with notice that it intended to depart on this ground, Himler would have been entitled to discovery concerning the effect of the offense on the solvency or financial security of the victims. Similarly, counsel claims that she would also have mounted an additional defense against upward departure based on the fact that once the condominium sold on April 14, 2003 for $181,000, the figure of the actual loss caused by Himler plunged precipitously. Furthermore, counsel explained that she would have investigated the relationship between CSS, Curiale, and Hanna, the seller of the condominium, with an eye toward uncovering why CSS never attempted to void the transaction once the fraud was discovered. Finally, she states that she would have presented arguments that an upward departure was not permitted by U.S.S.G. § 2B1.1 cmt. n.15 (A)(iii)-(v).

The government's bare assertion that Himler would have done nothing differently had notice been given is convincingly refuted by defense counsel's detailed explanations as to what, in fact, would have been done differently had notice been given. Under these circumstances, we cannot agree with the government's contention that the District Court's error was harmless. We will therefore vacate the judgment and remand to the District Court for resentencing so that it can provide Himler with the opportunity to put on a defense against the upward departure. Since we are remanding this case for a new sentencing hearing, we need not decide whether the District Court did, in fact, rule on the motion for downward departure, nor will we reach the merits of granting such a departure. Similarly, we will not reach the merits of the imposition of an upward departure. Rather, in order to give the District Court maximum flexibility at the resentencing hearing, we will leave these questions open for the District Court's reconsideration and enable it to review the sentence as a whole.

## IV.  Restitution

At the sentencing hearing, the District Court ordered Himler to pay restitution in the amount of $193,833 — the

amount he paid for the condominium — to be reduced by the ultimate net proceeds from the sale of the condominium. On appeal, Himler challenges that order on two grounds. First, he argues that the District Court erred when it ordered any restitution at all. Second, he complains that the court "postponed" the final determination of the amount of restitution pending CSS's sale of the condominium, a postponement it is not empowered to make under 18 U.S.C. § 3664 (d) (5). We exercise plenary review as to whether restitution is permitted by law and apply an abuse of discretion standard as to the appropriateness of a particular award. *See United States v. Simmonds*, 235 F.3d 826, 829 (3d Cir. 2000).

Himler argues that the District Court was not allowed to order restitution pursuant to 18 U.S.C. § 3664 (j) (2) which provides that "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in — . . . (B) any State civil proceeding to the extent provided by the law of the State." Himler contends that because he deeded the condominium to CSS before the sentencing as part of the settlement of the civil law suit, the condominium was not "later recovered as compensatory damages for the same loss." We disagree.

Under the Mandatory Victims Restitution Act ("MVRA"), restitution is mandatory for particular crimes, including property offenses committed by fraud or deceit. *See* 18 U.S.C. § 3663A (c) (1) (A) (ii). Under this provision, restitution may come in many forms, including cash payments or "in-kind payments," such as property. 18 U.S.C. § 3664 (f) (3) (A). In many cases involving damage, loss, or destruction of property, return of the property is enough to satisfy a restitution obligation. *See* 18 U.S.C. § 3663A (b) (1) (A). In some cases, however, where return of the property is "inadequate," the MVRA authorizes restitution of the difference between the value that the property had on the date of the crime and any value that the property retained after the criminal act. 18 U.S.C. § 3663A (b) (1) (B).

In the case at bar, CSS was not a seller of the condominium who was returned to his or her pre-crime

position upon reobtaining title to the condominium. Rather, CSS was the settlement company that facilitated the purchase and sale between Hanna and Himler. At the closing, CSS took Himler's counterfeit checks and paid Hanna $193,833. By the time the closing was complete, Hanna had $193,833, Himler had title to the condominium, and CSS had a loss of $193,833. Even though Himler deeded the condominium back to CSS, he had purchased it at an inflated price; similar units were generally selling between $150,000 and $160,000 as opposed to $193,833, the amount that Himler had paid.[2] Consequently, we conclude that even though the property was deeded back to CSS, that return did not adequately compensate CSS for its loss and the District Court was entitled to enter the restitution order as a matter of law.[3]

Himler also argues that in not valuing the property on the day of sentencing, but in stating that the restitution would be $193,833 minus the amount the condominium eventually sold for, the court abused its discretion. *See United States v. Lomow*, 266 F.3d 1013, 1020 (9th Cir. 2001) ("[T]he amount of restitution must be reduced by the value of the property as of the date the victim took control of the property. . . . A district court abuses its discretion by valuing the property at the time of the final disposition by the victim rather than at the time the victim gained control of the property." (emphasis deleted; alterations, quotation marks, and citations omitted)). Himler characterizes the District Court's decision on this issue as a *postponement* of the final determination of the amount of restitution. We disagree with this characterization of the District Court's

2. Even Himler's counsel conceded that it was unlikely that anyone would purchase the condominium for a price approaching $193,833 admitting that Hanna, the original owner, "got a real windfall because he was able to sell his condo for more than it was worth."

3. The situation would be different if Himler had entered into a direct purchase and sale agreement with Hanna. In that case, return of the property would have been adequate restitution. Under the facts of this case, however, CSS is entitled to restitution for the full amount of money it paid Hanna on Himler's behalf: the $193,833 minus the sale price of $181,000. The only way for CSS to recoup the missing $12,833 is for Himler to pay CSS.

action. The District Court did not "postpone" final determination of the restitution award: rather, it ordered Himler to pay full restitution in the amount of $193,833, allowing for reduction in that amount when the property sold.

The government concedes that 18 U.S.C. § 3663A (b) (1) (B) (ii) requires a District Court to "value" the property "as of the date the property is returned" to the victim. *See Lomow*, 266 F.3d at 1020. However, it submits that the District Court properly accepted Curiale's testimony that "real estate is only worth what you can get for it." We agree that the District Court's decision to order restitution in the amount of $193,833 minus the amount that would eventually be recouped from the future sale was not a postponement of the order of restitution but simply a way to ensure that Himler would not be stuck with a larger bill than was necessary.

On April 14, 2003, the condominium sold for $181,000.[4] Thus, by subtracting the sale price, $181,000 from Himler's purchase price of $193,833, Himler is left owing $12,833. Had the District Court been forced to set a defined value for the condominium at the sentencing hearing, it would probably have valued it at somewhere between $150,000 and $160,000 because that is what similar units were selling for and even Himler's counsel conceded that it was unlikely that anyone would buy it for $193,833. As luck would have it, market forces enabled the condominium to sell for a considerably higher price than was originally anticipated. Thus, Himler was left with a much smaller bill, $12,833 than the amount he would have owed had the District Court placed a fixed price on the condominium at the sentencing hearing. The District Court did not abuse its discretion in setting the amount of restitution it did, and its judgment on this issue will be affirmed.

---

4. Upon the sale, the government notified the District Court and requested that the restitution order be clarified to reflect the sale price of the condominium. The District Court refused to do so because it believed that it lacked jurisdiction while this case was pending on appeal.

## V.  Conclusion

For the foregoing reasons, the judgment of the District Court will be affirmed in part and vacated in part and remanded for further proceedings consistent with this opinion.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*